George Harris v. Commissioner.
Harris v. Commissioner
Docket No. 59141.
United States Tax Court
T.C. Memo 1957-217; 1957 Tax Ct. Memo LEXIS 33; 16 T.C.M. (CCH) 994; T.C.M. (RIA) 57217; November 26, 1957
*33 Allen M. Mesirow, Esq., for the petitioner. Thomas N. Chambers, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined a deficiency in petitioner's income tax for the year 1947 in the amount of $9,229.18, together with additions to tax under sections 293(b), 291(a), 294(d)(2), and 294(d)(1)(A) of the Internal Revenue Code of 1939 in the respective amounts of $4,614.59, $2,307.30, $553.75, and $922.92. Petitioner filed no return for the taxable year. Respondent determined that petitioner had partnership income during the year in the sum of $9,799.91 and other income in the amount of $16,962.68. An "EXPLANATION OF ADJUSTMENTS" attached to the notice of deficiency reads as follows: EXPLANATION OF ADJUSTMENTS It has been determined that you failed to report your distributive share of income from the partnership known as Glboe [Globe] International Company, computed as follows: Sales
$34,912.19
Less: Purchases and expenses
28,232.57
Balance
$ 6,679.62
Add: Unidentified bank deposits
12,920.21
Partnership net income
$19,599.83
Your distributive share (50%)
$ 9,799.91
(b) It *34 hass been determined that you received income in the amount of $16,962.68 consisting of unexplained bank deposits. (c) The standard deduction of $500.00 has been allowed. In the amended petition filed herein petitioner alleges error with regard to all matters covered by the respondent's determination of deficiency and additional taxes. It states the facts upon which the petitioner relies as the basis of this proceeding as follows: "(a) Petitioner did not have any taxable net income from the partnership known as Globe International Company for the year 1947. "(b) Petitioner did not have any other taxable income for the year 1947." In his answer to the amended petition respondent reiterated the matters contained in his explanation of adjustments attached to the deficiency notice, and further alleged that petitioner failed to file a Federal income tax return for the taxable year 1947 with fraudulent intent to evade and defeat Federal income taxes, although he knew that he had realized taxable income during that year. Findings of Fact The parties have stipulated part of the facts, and we find them to be as stipulated. The original name of petitioner was George M. Heisner. *35 His name was legally changed to George Harris in 1951. During the taxable year petitioner lived at 2144 Bronx Park East, New York City, New York. During that year he was married and had one child. Petitioner filed a Federal income tax return for the year 1946 and for several years prior thereto. He filed a Federal income tax return for the year 1948 showing total income in the amount of $559.51. In this return petitioner did not answer the questions: "If you filed a return * * * for a prior year, what was the latest year?" and "To which Collector's office was it sent?" Petitioner filed no Federal income tax return for the taxable year 1947. During all of his business life petitioner has been engaged in selling. During the months of January and February 1947 petitioner was engaged as an individual in the business of selling electrical appliances for export. He had been engaged in this business for some indeterminate time prior to 1947, which business was carried on by him under the name Globe International Co. This name was registered by him as a trade name in New York on May 12, 1943. From sometime in 1945 to May of 1946 he served in the Armed Forces. Petitioner, operating as the *36 Globe International Co., had office space and an answering telephone service at 1123 Broadway, New York City. During the months of January and February 1947 petitioner made sales of some electric irons. In one of these sales transactions he sold 100 electric irons to J. A. Ewing & McDonald, Inc., for $3.50 per iron. The purchase price of these irons was "either $3.10 or $3.15 per iron." Petitioner also sold other electric irons which he purchased for $452.52. Petitioner also sold other electrical appliances during these months which are described by petitioner as "Washing machine or refrigerator, that is about all." Petitioner could not recall the sales price of such electrical appliances or the name of the vendor from which he purchased them. On February 19, 1947, petitioner sold for export to J. A. Ewing & McDonald, Inc., 6,000 toggle switches at a price of 35 1/2 cents per switch, and on February 21, 1947, received in payment a check in the amount of $2,130 which was not deposited in his bank account but was cashed by him. Of these toggle switches, 3,000 were consigned to Durban, South Africa, and 3,000 to Capetown, South Africa. In January 1947 petitioner made 11 deposits *37 in his bank account totaling $2,140.73, and in February he made 10 deposits totaling $2,698.95. His bank balance on January 1, 1947, was $108.90 and his balance on March 1, 1947, was $22.20. Of the deposits made in each of these 2 months, 4 were in amounts of $200 or more. A deposit of $1,075 was made on February 14, and a check was drawn on his account on February 19 in the sum of $1,002.77. No explanation of these entries in petitioner's bank account was given except for petitioner's testimony that one deposit in the amount of $350 represented the proceeds from the sale of electric irons and one withdrawal in the sum of $452.52 represented the purchase price of electric irons. Sometime prior to February 13, 1947, petitioner made a sale of toggle switches to an engineering company in Johannesburg, South Africa, and was advised on that date by the Irving Trust Company of New York that a bank in South Africa had issued its irrevocable credit in his favor to the extent of $2,200, available by his draft on the Irving Trust Company accompanied by a bill of lading and invoices evidencing the shipment of toggle switches to Port Elizabeth, South Africa. A check on this account, drawn by *38 the Irving Trust Company and payable to Globe International Co. in the amount of $1,838.27, was received by petitioner on or about March 31, 1947. During the first part of March 1947 petitioner and Julius M. Schwartz formed a partnership to continue the export sales business under the name of Globe International Co. Petitioner and Schwartz were to be equal partners. On March 5, 1947, a partnership bank account was opened under the partnership name of Globe International Co. with the Colonial Trust Company of New York City. In the authorization of this partnership bank account its place of business was designated as 105 Nassau Street, New York City, but petitioner testified the business was located at 80 Warren Street, New York City. Schwartz lived in petitioner's neighborhood and was in the electrical business. At that time petitioner had prospects of making considerable sales of electric toggle switches through J. A. Ewing & McDonald, Inc., and expected assistance from Schwartz in financing these purchases. Neither in his individual business nor in the partnership business did petitioner maintain any warehouse. Shipments were made pursuant to any sales directly to the purchaser *39 by the supplier from whom petitioner or the partnership obtained the materials sold. Petitioner had had for some time prior to 1947 a friendly acquaintance with Joseph Gerlach, who in 1947 was general manager of J. A. Ewing & McDonald, Inc. In July of 1946, after petitioner was discharged from the Army, he borrowed $2,000 from Gerlach in order to reestablish his business. On March 17, 1947, Gerlach loaned petitioner for use in the partnership business the sum of $6,000. On the same date an opening deposit in the amount of $6,000 was made in the partnership's bank account. A repayment was made to Gerlach in the amount of $5,000 on April 2, 1947. On April 21, 1947, Gerlach made another loan to petitioner for use in the partnership business in the amount of $5,000. Gerlach's check in this amount was endorsed by petitioner and was also endorsed by National Electrical Products Co., from which company petitioner obtained the toggle switches sold by him. This amount was not credited on the account of Globe International Co. with National Electrical Products Co. and was not shown as a receipt on the partnership's journal. On March 15, 1947, petitioner borrowed for use in the partnership *40 business the sum of $5,000 from Cohen & Ganbaum Co. of New York City. This loan was adequately secured by the pledge of personal property belonging to Schwartz. It was never repaid. The proceeds of this loan were not deposited in the partnership's bank account. However, the sum of $4,000 in cash was paid to National Electrical Products Co. on March 24 by the partnership. On March 5, 1947, petitioner and Schwartz obtained a loan from Colonial Trust Company in the amount of $7,407.29 and executed their note in the amount of $7,500, payable to Colonial Trust Company 90 days after date. The proceeds of this note were not deposited in the partnership's bank account. However, on March 5, 1947, the partnership made a deposit of $5,000 on its account with National Electrical Products Co. This note was endorsed by Benjamin J. Buttenwieser as an accommodation endorser. On June 3, 1947, this note was presented for payment, but payment was not made. Thereupon, Buttenwieser paid the note and thereafter obtained a judgment against petitioner and Schwartz in the total amount of $7,660.48. In connection with the partnership business petitioner acted as the sales manager and Schwartz as the office *41 manager. The manufacturing concern from which petitioner and later the partnership purchased toggle switches was originally known as Ken Rod Manufacturing Company and later National Electrical Products Co. Its business was carried on prior to April 16, 1947, by the receiver in bankruptcy of Ken Rod Manufacturing Company. Joseph Brown was one of the officers of the manufacturing company which was principally engaged in the manufacture of water heaters. Through Brown petitioner induced the manufacturing concern to manufacture toggle switches. It was necessary for the petitioner and the partnership to pay the manufacturing concern in advance before the receipt of the merchandise order. During the time the partnership was in existence it purchased for sale 100,000 toggle switches from the manufacturing concern, 50,000 of which were purchased during the time that the business as a manufacturing concern was carried on by the receiver in bankruptcy. Petitioner and the partnership paid to the manufacturing company 26 1/2 cents per switch and sold them for 35 1/2 cents per switch. The books of the manufacturing company show the purchase by Globe International Co. of 100,000 toggle switches *42 during the months of March and April 1947, together with small charges for freight, samples, and folders advertising water heaters, and during the same period payments by Globe International Co. in the total sum of $26,614.43. The only books and records of the partnership available at the trial herein consisted of a journal, ledger, and a photostatic copy of its bank account. All supporting records and canceled checks (except for a photostatic copy of the last check drawn on the partnership bank account) have been lost or destroyed. The available books of the partnership are inadequate and inaccurate. The partnership terminated on May 23, 1947, or shortly thereafter. In addition to the sale of toggle switches, the partnership attempted to sell other electrical appliances for export. It acted as export agent for the William G. Knott Company and, as a result of that company not supplying certain appliances which the petitioner had purportedly sold on its behalf, the partnership asserted a claim against that company for breach of contract. This claim was later settled and, as a result thereof, petitioner received at least $500 on August 8, 1947. Petitioner made personal withdrawals *43 from the funds of the partnership during its existence in the total sum of $5,611. Schwartz's personal withdrawals from the partnership funds for the same period were in the total amount of $8,818.86. The books of the partnership show total business expenses in the amount of $1,306.14. Beginning in April 1947 petitioner and Schwartz began to kite checks for their benefit and the benefit of the partnership. An unascertainable proportion of their individual bank accounts and the bank account of the partnership represents the result of this illegal practice. At some time during the latter part of May 1947 petitioner went to Mexico. The available books of the partnership do not disclose the expenses of this trip as charged against the partnership and the source of petitioner's expenses is not disclosed by his own bank account or that of the partnership. Anticipating the deposit in the partnership bank account of $9,072.54, representing the proceeds of a sale made by the partnership, petitioner gave a check drawn on the partnership bank account in the sum of $8,250 to Joseph Gerlach as payment of the balance of $6,000 due on loans made by Gerlach for use in the partnership business, *44 plus $2,000 in payment of the loan made to petitioner personally in July 1946, together with an additional amount of $250 which apparently represented interest. This check was dated May 19, and payment was refused by the bank because of insufficient funds. The sum of $9,072.54 was deposited in the partnership bank account on May 23, 1947. On May 27, 1947, a check signed by both of the partners and drawn on the partnership bank account to the order of Schwartz in the sum of $8,987.50 was cashed by Schwartz and closed out the account. From the proceeds of this check Schwartz paid Gerlach $3,000, out of which Gerlach applied $823.68 to the payment to J. A. Ewing & McDonald, Inc., on account of a worthless check drawn to its order on the partnership bank account on or about May 21, 1947, and applied the balance of $2,176.32 to a payment on his loans. Gerlach subsequently obtained a judgment against petitioner, Schwartz, and Globe International Co. in the sum of $6,501.39. In April 1947 petitioner made 8 deposits in his personal bank account in the total sum of $3,270. His balance at the end of the month was $31.25. In May he made 5 deposits totaling $1,200. His balance at the end of *45 the month was 25 cents. In June he made 6 deposits to his account in the total sum of $1,200. His balance at the end of the month was $75.10. In July 1947 petitioner made 12 deposits in the total amount of $2,109.83. His balance at the end of that month was $39.12. In August petitioner made 7 deposits to his account in the sum of $1,020. His balance at the end of the month was $16.90. In September 1947 petitioner made 12 deposits to his bank account in the total amount of $1,410. His balance at the end of that month was $2.63. In October petitioner made 15 deposits to his account in the total sum of $1,600. His balance at the end of that month was 11 cents. In November 1947 petitioner made 2 deposits to his account in the total sum of $380, and his balance at the end of that month was $114.21. In December 1947 petitioner made 2 deposits to his bank account in the total sum of $580, and his balance at the end of that month was $6.39. In August 1947 petitioner borrowed $185 from his brother Randell. On October 24, 1947, he borrowed $150 from his sister-in-law. No deposit in the amount of $185 was made in petitioner's bank account in the month of August, and no deposit was made in *46 his account in the month of October after October 21. Petitioner also borrowed money from other members of his family and his wife's family during the latter part of 1947. During the first part of November 1947 petitioner and Allan Palmer, a neighbor and friend of petitioner, entered into a joint venture, the purpose of which was to sell guns and ammunition for export. Palmer's original name was Abraham Puketky. At the suggestion of petitioner he legally changed his name because petitioner told him that his original name would not be good for business. Petitioner told Palmer that he had advantageous contacts in Mexico, and that the sale of guns and ammunition for export would be profitable. This joint venture was operated under the name of Palmer International Co. It had a bank account under that name at the Chase National Bank. Petitioner's personal bank account was kept at the National Bronx Bank. Petitioner contributed to the joint venture his export license and his salesmanship. Palmer and his sister contributed money to the joint venture. Shortly after the joint venture started, petitioner traveled to Mexico on behalf of the joint venture and made some sales there. None of these *47 sales were reported to Palmer, who received no income therefrom. On December 22, 1947, Palmer cashed a check for $1,500 on the bank account of the joint venture, and gave the proceeds to petitioner who had told Palmer that he needed this amount to pay the Savage Arms Co. for an order placed with that company on behalf of the joint venture. Thereafter, Palmer discovered that no order had been placed with the Savage Arms Co. This caused Palmer to begin to doubt petitioner. After a conversation which Palmer had with a former partner of petitioner, he decided to withdraw from the joint venture. During the course of the joint venture, a retail store was rented in Mount Vernon, New York, but it was never stocked. On January 14, 1948, at or about which time the joint venture was terminated, petitioner executed a note payable to Palmer, without interest, in the sum of $2,000. On May 29, 1950, petitioner filed a petition in bankruptcy in the District Court of the United States for the District of Columbia. Among the debts listed in that petition were the following: A debt in the amount of $5,000 owed to Cohen & Ganbaum Co.; a debt to J. Gerlach in the amount of $6,501.39; a debt to A. *48 G. Jorgensen of Johannesburg, South Africa, on account of "Commissions-Partner, J. M. Schwartz" in the amount of $3,500; a debt to B. Buttenwieser in the sum of $7,500; and a debt to Allan Palmer on account of "Loan-Note to Ex-partner Allan Palmer" in the amount of $903, together with other smaller debts indicated as having been incurred while petitioner was a partner of Schwartz. One of the debts listed in the amount of $300 was indicated as being incurred for merchandise while petitioner was a partner of Palmer. A certified public accountant, called as a witness by petitioner, testified that petitioner's net income for the taxable year, as based upon his bank deposits, was in the amount of $4,332.48. This testimony was predicated upon an examination of the documents in evidence, upon the assumption that all of the testimony given by petitioner in this proceeding was correct, and also upon other assumptions made by the witness favoring contentions of petitioner. Among the matters assumed by this witness, which were not proved by the testimony herein, were the deposit in petitioner's bank account of amounts borrowed in the total sum of $1,200, the deposit in petitioner's bank account *49 of the sum of $2,500 received by him from Allan Palmer, and the deposit in petitioner's bank account of the check received by petitioner from J. A. Ewing & McDonald, Inc., on February 21, 1947, which check was cashed by petitioner. The testimony of this witness did not assume the receipt by petitioner of any amount as a result of a settlement of a breach of contract claim. Petitioner received taxable income during the year 1947 in the amount of at least $6,000. Petitioner filed no individual or partnership Federal income tax returns of any kind for the year 1947. Petitioner failed to file a Federal income tax return for the taxable year 1947 with fraudulent intent to evade and defeat Federal income taxes, although he knew that he had realized taxable income during that year. A part of the deficiency here involved is due to fraud with intent to evade tax on the part of petitioner. Opinion KERN, Judge: It is impossible to determine with certainty from the extremely unsatisfactory record before us in the instant case the exact amount of taxable income received by petitioner during the year 1947. Of two things we are certain: (1) That petitioner did receive income during this *50 year in a considerable amount, and (2) that the amount of that income was less than that determined by respondent. Petitioner himself was an unsatisfactory witness. From his demeanor on the stand, the transcript of his testimony, and the entire record we have formed the opinion that he is shifty and unreliable, and a witness in whose frankness and veracity we can have little confidence. Petitioner called as a witness a certified public accountant who in our opinion had done a thorough job in analyzing the meager and inadequate data available. The principal materials he had to work with were the monthly bank statements covering the bank accounts of petitioner, of Schwartz, and of their partnership. He also had the admittedly incomplete journal and ledger of the partnership, the transcript of the partnership's account with National Electrical Products Co., copies of certain checks and shipping documents, and the facts stipulated concerning certain loans made to petitioner. In addition, he assumed as true all facts testified to by petitioner. From this data he gave his opinion as an expert witness called by petitioner that petitioner's net income for the year 1947, as based on his *51 bank deposits, was "Somewhere in the neighborhood of $4,332.48." We do not question the good faith of this opinion, but it is apparent that in arriving at a figure this low (but high enough in itself to require the filing of a return and the paying of tax by petitioner) the witness assumed facts not justified by the record herein. Some of these we have pointed out in our findings. In attempting to ascertain the amount of petitioner's income for the taxable year, we have started with the figure testified to by petitioner's expert witness and, having made adjustments required by the record, we have determined a figure for petitioner's net income for the taxable year which is in a minimal amount. It may be more, but we are confident that it is not less. We have taken this conservative approach to the question of the amount of petitioner's net income because this is a fraud case, because the trial herein took place 10 years after the taxable year, and because we are not sure that the absence of supporting records was due to the fault of petitioner. With regard to the fraud issue, we are convinced by the entire record that petitioner's failure to file a Federal income tax return for *52 the taxable year was due to his deliberately formed intention of avoiding the payment of taxes. It is our conclusion that although petitioner realized net income of at least $6,000 during that year, he was in straitened circumstances during the latter part of the year and in the succeeding year, and found it difficult to pay the taxes which would have been due if he had filed a correct return of his income. He chose not to file a return. In 1948 he moved to Washington, D.C. In 1949 he filed a return for 1948 upon which no tax was due. In this return he did not answer the questions which would have indicated that he had filed returns for prior years in New York and that no return had been filed for 1947. To excuse himself for his failure to file a return for the taxable year, petitioner principally relies upon his own unsupported testimony that he went into the office of the Internal Revenue Service in Mount Vernon, New York (where petitioner did not live), waited in line until he could talk to an agent, and then asked the agent the following question: "If I didn't make any money, do I have to file a return?" to which question the agent gave the following answer: "If you didn't make *53 any money, you don't have to file a return," whereupon and without further conversation petitioner withdrew. Even if we assume the veracity of this testimony (which we doubt) it is not helpful to petitioner. Rather, the addressing of this "loaded" hypothetical question, based on a hypothesis known by petitioner to be false, to a revenue agent in a locality in which petitioner did not live and obviously calling for an answer calculated to excuse petitioner from filing a return, indicates that petitioner's purpose in this conversation was to obtain a fictitious justification for a course of action upon which he was already determined. Upon the fraud issue we find in favor of respondent. The additions to tax determined by respondent are approved in amounts to be computed under Rule 50. Decision will be entered under Rule 50.